875 A.2d 734

**In re BILLY W., Jessica W., Mary S. & George B.**

**No. 100, Sept. Term, 2004.**

Court of Appeals of Maryland.

June 13, 2005.

406

408

410

Geraldine K. Sweeney, Assistant Public Defender (Nancy S. Forster, Public Defender, on brief), Darcy Rood Massof, Assigned Public Defender, Baltimore, for appellants.

C. J. Messerschmidt, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore), on brief, Francine Krumholz (Emily Rody and Seri Wilpone of the Legal Aid Bureau Inc. of Towson), on brief for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J. as to Part I.

In this action between the biological parents and the State, we have been asked to consider whether the trial court properly admitted hearsay testimony by a social worker and two Court Appointed Special Advocates [1] during a hearing to

---

. **1.** A Court Appointed Special Advocate ("CASA") has been described as "a trained community volunteer, appointed by a judge, to represent the best interests of children in cases that come before the court due to alleged abuse or neglect." NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION, JUDGE'S GUIDE TO CASA/GAL PROGRAM DEVELOPMENT [hereinafter "NCASAA JUDGE'S GUIDE"] 15 (2004).

review the permanency plans for children who had been declared in need of assistance. Because we have held that application of the Maryland Rules of Evidence is not mandatory in permanency planning hearings, the Circuit Court did not commit error in admitting hearsay testimony from the social worker and the Court Appointed Special Advocates during the permanency planning proceeding.

## Facts and Procedural History[2]

Ms. B., an Appellant in this case, has four children who are the subjects of the permanency planning hearing at issue: Mary S., born in 1991, Jessica W., born in 1992, Billy W., born in 1994, and George B., born in 2000. The father of Mary S., Jessica W., and Billy W. is deceased. George B.'s father is Mr. B., another Appellant in this case, to whom Ms. B. was married, but from whom she is now separated. All four children resided with both Mr. and Ms. B. prior to the separation. The family first came to the attention of the Baltimore County Department of Social Services ("DSS") when Mary S., then eight years old, alleged that she had been sexually abused by Mr. B., who was later charged and convicted. DSS, during its investigation of the sexual abuse allegations, determined that Ms. B. was aware of Mr. B.'s past history of sexual abuse and knew of Mr. B.'s behavior with Mary S., but had failed to take appropriate action to protect the girl. All of the children, nevertheless, remained in Ms. B.'s care after she and Mr. B. separated. During the next two years, while the children were in Ms. B.'s care, there were four additional investigations by DSS of abuse and neglect, including allegations that Mary S. had sexually abused Billy W.

On February 7, 2002, DSS removed all four children from Ms. B.'s care, placed them under emergency shelter care, and subsequently filed a petition in the Circuit Court for Baltimore

---

**2.** Many of the following facts are substantially the same as those recited in a related case, *In re Billy W., Jessica W., Mary S., and George W.,* 386 Md. 675, 874 A.2d 423 (2005).

County requesting judicial approval of shelter care for the children. The court conducted a hearing and ordered DSS custody of the children and shelter care for them, pending an adjudicatory hearing.[3] Thereafter, during the adjudicatory hearing, all four children were declared to be children in need of assistance ("CINA")[4] and committed to the care and custody of DSS for placement in foster care. The court also ordered that Ms. B. be permitted two hours supervised visitation once per week with all four children and that Mr. B. would have one hour supervised visitation once per week with George B.[5] At that time, the permanency plan[6] for the children was reunification solely with Ms. B.

---

**3.** An adjudicatory hearing is "a hearing under this subtitle [Juvenile Causes] to determine whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true." Md.Code (1973, 2002 Repl.Vol.), § 3–801(c) of the Courts and Judicial Proceedings Article.

**4.** Md.Code (1973, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article defines a CINA as:
"Child in need of assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

**5.** The court further ordered that Ms. B. satisfy the following conditions: ORDERED that ... reasonable efforts continue to be made to make it possible for the children to return home. Conditions—Mother is to cooperate with DSS in providing background information, signing release forms for any educational, medical or any other information needed to provide services for children and family.... Mother is to continue and finish parenting skills classes and sign release of information regarding parenting class. Mother is to submit to a psychiatric and psychological evaluation by a qualified doctor in respect to her parenting abilities and techniques, she is to follow any recommendations for treatment as a result of the evaluation.

**6.** Md.Code (1984, 1999 Repl.Vol.), § 5–525(e) of the Family Law Article states:
*Development of a permanency plan.*—(1) In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child. The local department shall consider the following factors

Initially, DSS placed Billy W. and George B. together in a foster home; however, both boys were removed due to allegations that Billy W. had sexually abused a younger child in the home. After a brief stay in another home, Billy W. was committed to St. Vincent's Center, a residential treatment center, from June 2002 until November 2003, when DSS transferred him to a therapeutic foster home. During that same time George B. was moved to another foster home where he has remained.

Mary S. and Jessica W. were placed together in a foster home; after six weeks both were moved to a therapeutic foster home. In August 2002, Mary S. was admitted to

in determining the permanency plan that is in the best interests of the child:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

In addition, Md.Code (1973, 2002 Repl.Vol.), § 3–823(e) of the Courts and Judicial Proceedings Article states:

*Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:

(1) Determine the child's permanency plan, which may be:

(i) Reunification with the parent or guardian;

(ii) Placement with a relative for:

1. Adoption; or

2. Custody and guardianship;

(iii) Adoption by a nonrelative;

(iv) Guardianship by a nonrelative;

(v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;

(vi) Continuation in placement for a specified period because of the child's special needs or circumstances; or

(vii) Independent living; and

(2) For a child who has attained the age of 16, determine the services needed to assist the child to make the transition from placement to independent living.

Sheppard Pratt Hospital for suicidal behavior, where she was diagnosed with "aggressive disorder recurrent with psychosis" and "possible dissociative disorder." Mary S. stayed at Sheppard Pratt for six weeks, was discharged and moved to transitional housing, and then to the Villa Maria Residential Treatment Center for six months, before returning to the original therapeutic foster home in May 2003. Jessica W. has remained in the original therapeutic foster home the entire time.

The Circuit Court conducted periodic review hearings,[7] and on June 23, 2003, DSS recommended, and the court ordered, a change in the permanency plan for George B. from reunification to a concurrent plan of reunification with Ms. B. and adoption. The court also increased Billy W., Jessica W., and Mary S.'s visitation with Ms. B. to include, in addition to supervised visitation, one hour of unsupervised visitation. The reunification plan with Ms. B. for the three children remained unchanged. Mr. B.'s visitation was changed to one hour supervised visitation per month with George B. Ms. B. did not object to the maintenance of the permanency plans for Billy W., Jessica W., or Mary S. Both parents contested the change in the permanency plan for George B., and noted separate appeals to the Court of Special Appeals, which affirmed the judgment of the Circuit Court in a consolidated unreported opinion. While that appeal was pending in the Court of

---

7. Md.Code (1973, 2002 Repl.Vol.), § 3–823(h) of the Courts and Judicial Proceedings Article states:

 *Periodic reviews.*—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded.

 (ii) The court shall conduct a review hearing every 12 months after the court determines that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis.

 (iii) 1. Unless the court finds good cause, a case shall be terminated after the court grants custody and guardianship of the child to a relative or other individual.

 2. If the Court finds good cause not to terminate a case, the court shall conduct a review hearing every 12 months until the case is terminated.

Special Appeals, the Circuit Court held another six month review hearing on November 10, 2003, in which the trial judge once again continued the commitment of all four children to the care and custody of DSS. The judge also ordered that Ms. B.'s visitation with Billy W. and Jessica W. would remain two hours supervised per week and one hour unsupervised per week. As to Mary S., the parties agreed and the court acquiesced in the decision that Ms. B. would be permitted one hour supervised visitation per week, but that the unsupervised visitation would be suspended.[8] With respect to George B., Ms. B.'s visitation remained three hours, but the supervised visitation was reduced to one and a half hours per week. Mr. B.'s visitation with George B., one hour supervised visitation per month, was not changed. Both Ms. B. and Mr. B. noted separate appeals from the court's order regarding George B., to the Court of Special Appeals, which in an unreported opinion, addressed the substantive issues raised by the parties and affirmed the judgment of the Circuit Court.[9]

Subsequently, while that appeal was pending in the Court of Special Appeals, the Circuit Court held a three-day review hearing on April 23, 2004 and May 4–5, 2004, which is the subject of this appeal. At the hearing, sixteen witnesses testified, including Ms. Kristy Caceres, a DSS social worker

---

8. During the November 10, 2003 hearing, Ms. Kristy Caceres, a DSS social worker assigned to the case, testified about the visitation between Ms. B. and Mary S.:

 As of right now Mary sees her mother during family therapy.... The Court had specified that Mrs. B. was entitled to unsupervised visits with Mary as well as the supervised portion. It was several months, at least as of August, that stopped. Mary indicated to first her foster parent, then to workers, and then to her mother, Mrs. B. that she did not want to have unsupervised visits with her mother, and those—and Mrs. B. agreed and it stopped.

9. *See In re George B., Billy W., Jessica W. & Mary S.*, Nos. 2239, 2266, 2267, 2269, September Term 2003 (filed August 18, 2004). Thereafter, Ms. B. appealed the decision of the Court of Special Appeals, and this Court dismissed her case holding that because the order relating to George B. did not detrimentally affect Ms. B.'s parental rights, the order was not appealable. *See In re George B., Billy W., Jessica W. & Mary S.*, 386 Md. 675, 874 A.2d 423 (2005).

assigned to the case, who testified about the progress of the children and the children's interaction with both Ms. B. and Mr. B. When DSS questioned Ms. Caceres about the progress of the children's family therapy, the following ensued:

[DSS's COUNSEL]: And is that family therapy progressing as desired?

[MS. CACERES]: The last that I talked to the therapist, she seemed to think that there were some—

[Ms. B.'s COUNSEL]: Objection.

[THE COURT]: Basis?

[Ms. B.'s COUNSEL]: Hearsay.

[THE COURT]: It's a review hearing. I think there's some latitude.

[Ms. B.'s COUNSEL]: Again, I'm going to ask for a continuing objection to hearsay from therapists who aren't present to testify and could have been.

[THE COURT]: All right. Overruled.

Ms. Caceres continued to testify that she spoke with the children's therapist, who was not present at the hearing, about the children's family therapy and that the therapist "seemed to think that there was some progress. Things were going okay." Counsel for Ms. B. again objected on the grounds of hearsay, to which the hearing judge replied: "It's a review hearing. Strict rules of evidence don't apply if there's some foundation for the knowledge, but there's some latitude." After the judge overruled the hearsay objection, Ms. Caceres opined that the permanency plans for the children should not be changed because there had been "minimal progress in Ms. B.'s ability to focus on the kids and to provide for their individual needs." She also stated that DSS did not have the adoptive resources for the children and would not seek a termination of parental rights at that time. Ms. B. testified during the hearing that her relationship with the children was improving and that she would be able to care for the children if they were to be returned to her care.

Several social workers involved with supervising the visitation with George B. and Mr. B. also testified at the hearing.

All of the social workers uniformly stated that during a visit between Mr. B. and George B. in February 2004, Mr. B.'s behavior toward them was aggressive and erratic to a point that the police were called to remove Mr. B. from the building after he refused to leave the visiting room. The social workers also testified that during the altercation, Mr. B. became violent toward the police officers while George B. was present right outside the visiting room at the end of the visitation. Mr. B. testified during the hearing and denied that he had been loud and aggressive during the visit with George B., contrary to the testimony given by the social workers. Mr. B. explained that he only had expressed anger after George B. had been removed from the visitation room before the scheduled visitation time had lapsed. Mr B. further argued that he wanted George B.'s permanency plan to be changed to a concurrent plan of reunification with both Mr. and Ms. B., and in the alternative, increased visitation would be acceptable.

At the conclusion of the witness testimony, the trial judge referred the parties to the written reports of two Court Appointed Special Advocate ("CASA") volunteers assigned to the cases, who were present during the hearing:

[COURT]: Well, CASA is here. Usually at a review hearing I ask CASA if they have anything to add other than what's contained in the record.

[MR. B.'s COUNSEL]: But you accept the report in its entirety? I have not participated in one of these before.

[COURT]: The reports are filed as part of the Court file. If anyone has questions about them they can ask CASA. Or, if they want to inquire in any way, they can do that. Have you had a chance to review the CASA reports?

[MR. B.'s COUNSEL]: Yes. And Your Honor, I was troubled by the hearsay in it, and how it was kind of replete with some false statements ... and that kind of thing.

[DSS's COUNSEL]: I don't know how we address their report at this hearing.

[COURT]: Well, let's deal with the CASA reports in terms of what the objections or concerns are that you have about them.

After discussing the objections to the written reports, the judge explained that the parties could question the CASA volunteers about the reports and, then solicited testimony from both CASAs regarding the status of the children. Neither CASA volunteer was placed under oath prior to testifying at the hearing, and the CASA reports were not formally entered in evidence, although the record reflects that the reports previously had been reviewed by the juvenile court judge and the parties.

In response to questions from the hearing judge, the CASA volunteer assigned to the girls testified that Mary and Jessica had stated that they want unsupervised visitation with Ms. B., but that they did not want to return home to Ms. B. The judge inquired whether the parties had any questions for the CASA, to which each counsel replied in the negative.

The CASA assigned to the boys, Billy W. and George B., was then called to testify, and in response to questions posed by the trial judge, the CASA volunteer stated:

[COURT]: Mr. [CASA], can I ask ... the frequency of your contact with the boys?

[CASA]: It varies. Sometimes it's once a month and sometimes it's twice a month. I talk to the stepmothers probably more than I see the boys, to find out how they are getting along. I do have a couple of things that I would like to say that are probably not in that report.

[COURT]: All right.

[CASA]: ... it's about the conversations that they had with their mother when they are on unsupervised visits, or when they are on visits. The mother's inappropriate conversation is a main problem that's causing these children a lot of stress and strain.

[MS. B.'s COUNSEL]: Objection.

[MR. B.'s COUNSEL]: Objection.

[CASA]: This is my opinion.

[COURT]: Hold on. Hold on. What's the basis of the objection?

[MR. B.'S COUNSEL]: My basis was, he is expressing an opinion as to the main problem with these children. And again, that's inappropriate for him to say that.

[COURT]: Mr. [CASA], you can tell me about whatever they have told you about conversations with—

[CASA]: I will do that. In ... January, I took ... Billy out for lunch. . . . He always have been extremely pleasant, courteous, very polite. This particular visit was very strenuous on me. . . . Billy was belligerent, he was aggressive, he was very sharp with me. He wouldn't answer questions when I talked to him. So, I took him home and told the ... foster mom, that it didn't go well. I called [the foster mom] up later that week and she said that—

[MS. B.'S COUNSEL]: Objection.

[CASA]: I said that the visit went very bad. This is actually what happened.

[COURT]: What's the basis of the objection?

[MS. B.'S COUNSEL]: We are getting hearsay from the foster mom on what she said Billy said to her.

[COURT]: You know what, there is a statute that allows for CASA that permits precisely this. They are supposed to have contacts and report to the Court about the contacts.

\* \* \*

[CASA]: Anyhow, [the foster mom] told me that Billy said his mother said that I [the CASA] was a very bad person and that [Billy] should have no contact with me. He also said his ... foster mother was a very bad person, amongst other people. Now Billy knows better and he confides with me. On our ... last visit ... I confronted [Billy] with this question. We were going for a long ride, and [Billy] told me that his mom told him that I [the CASA] was a very bad person and that [Billy's] foster mother was also a bad

person, amongst other people in his school. And, that he was very mixed up and very confused.

\* \* \*

[CASA]: And then I asked [Billy], you know, and Billy was telling me on this particular visit, and others, that on Wednesdays he sometimes gets very stressed out. And I asked him, why do you get stressed out on Wednesdays, and he said because he was to make plans for what he is going to do on Thursday with his mother. And I said, what do you mean, Billy, and he said you know, I have to set it all up, I've got to make sure we do things right and go to the right places. I said, doesn't your mother handle that, and he said, no, she doesn't know the area and I have to handle it and I have to take care of it. This puts a lot of stress on this young man.

[COURT]: Okay.

The same CASA volunteer assigned to the boys also testified about George B.'s recent visits with Ms. B.:

[CASA]: Georgie, is, by his foster-mom, he cries himself to sleep sometimes right after visits.

[COURT]: Mr. [CASA], I've got to limit you to things that you see, you observe, what you know.

[CASA]: I've got that. The visit that I had with Georgie, two or three weeks ago, on Saturday he and I had a very nice long walk and talk, and this is what he said to me. He told me his mother made him feel bad and she called him bad names. And also, my father is in jail. That was from Georgie's mouth.

You know the foster parents have to pick up all the pieces of the visits, and it's getting tough on the foster parents. . . . That's the essence of what I have to say.

The trial judge then asked whether any of the parties had any questions to ask the CASA, to which the following dialogue ensued:

[MS. B.'S COUNSEL]: I have one. In all the time that you have been involved in this case have you ever talked with Mrs. B.?

\* \* \*

[CASA]: Well, I couldn't remember the dates. I have been involved with this two years.

[MS. B.'S COUNSEL]: It's been a while?

[CASA]: Probably.

[MS. B.'S COUNSEL]: Have you ever tried to contact her?

[CASA]: No. Should I?

[MS. B.'S COUNSEL]: Have you ever tried to raise these concerns?

[COURT]: Wait a minute. Wait. Wait. Wait. Wait. I have volunteers here who are giving their time. This is not to be confrontational. Mr. [CASA], it's not the time to push them either. You can ask questions about the report, so do you have another question?

[MS. B.'S COUNSEL]: No. No, I don't, Your Honor.

The judge then inquired a second time whether the parties had any further questions, to which each counsel replied in the negative.

At the conclusion of the hearing, the trial judge approved the extant permanency plans that all four children remain committed to the custody of DSS. With regard to visitation for Jessica W. and Mary S., the trial judge stated that "[v]isitation [with Ms. B.] should be weekly, and it should be unsupervised." The judge also ordered Ms. B. to participate in family therapy with the girls. In expressing concern about the interaction between Billy W. and Ms. B., the judge stated:

> With regard to Billy, the situation with Billy is more difficult because there are varying views of the appropriateness of comments that are made to him. My reaction to what I have heard on Billy is that he is still in a fairly fragile state. He has just come out of St. Vincent's, and he has had difficulty in adjusting. . . . On the one hand, there are

suggestions that time with his mother should be more meaningful and unsupervised. On the other hand, it appears that with Billy, that comments made in his presence have the potential to throw him off a little bit more. I am very concerned about this tension between Mrs. B. and the foster-mother because it's clear that there is something there, and it has to be resolved.

Accordingly, the hearing judge imposed the following conditions on Ms. B.'s visitation with Billy W.:

With Billy, the plan still remains the same. The question is, the supervision structure.... [Ms. B.] should have contact, phone contact with Billy, and Billy should have phone contact with his mother.

\* \* \*

What I want is Mrs. B. involved in [Billy W.'s] therapy and that there would be at least two therapeutic visits before we resume unsupervised visits.... I would like it done in a way that—I want [Ms. B.] involved in the therapy, and if there is a concern then the therapist can articulate that and then I can get some input on why it should remain supervised only.

The judge further determined that Ms. B.'s visitation with Billy W. would remain three hours per week, but the unsupervised visitation would be suspended until Ms. B. completed two family therapy sessions with Billy W.

In regard to Ms. B.'s visitation with George B., the judge stated:

With regard to George, I think that there should be some supervision still with the contact that [Ms. B.] has with him.... I would ask that the Department try to make the visits, while supervised, to do it if at all possible through a parent-aide, so that it's not Mrs. B. with the worker who is the person sort of in control of the situation, but with somebody with whom [Ms. B.] has a somewhat better or more relaxed relationship with. I would ask if you can explore whether the parent-aide would be available to supervise out-of-office visits, and at least twice a month, that

the visits, which would be likely, at least twice a month, that those would be out of the Agency. If those go well, and things stay on track and we don't have a recurrence on the types in the past, and comments, or problems that have been problematic, we can look again and do unsupervised. Right now I think we need to rein it back a little and have it under control.

The hearing judge next addressed Mr. B.'s visitation schedule with George B. and determined:

The question as to visits for Mr. B. is complicated by the fact that ... I would not burden the Department with supervising visits if the Department's agents didn't reasonably feel that they were safe in his presence or felt threatened in his presence.

\* \* \*

To the extent that I would permit visits to continue it would only be done with an outside monitor in place and in a neutral site.

It is my understanding that some of the sheriffs that are off duty will monitor supervised visitation and they'll do it at a fee.

I am advising [Mr. B.'s Counsel] of that, that I would consider a proposal for supervised visits by an outside monitor who is an off-duty law enforcement person, but it's going to be at Mr. B.'s expense.

Essentially, the court advised that, because of Mr. B.'s volatile behavior against DSS representatives during the visits, it would require that an off-duty officer supervise Mr. B.'s once per month visitation, at the expense of Mr. B.

Both parents, represented by the Public Defender's Office, noted separate appeals to the Court of Special Appeals.[10] Ms. B.'s brief presented the following question for review:

---

10. In the Circuit Court, the cases pertaining to each child were separately docketed; however, the various hearings were always consolidated to include all four children in a single hearing. On appeal to the

Did the trial judge err in admitting hearsay evidence at the permanency plan review hearing in these CINA cases?

Mr. B.'s brief presented the following question:

Whether the trial court abused its discretion by denying Mr. B.'s request to change the permanency plan to reunification with George B. and by eliminating visitation with him?

This Court issued, on its own initiative, a writ of certiorari, *In re Billy W.*, 384 Md. 448, 863 A.2d 997 (2004), prior to any proceedings in the intermediate appellate court.

### Appealability

In *In re Samone H. and Marchay E.*, 385 Md. 282, 869 A.2d 370 (2005), we considered whether an appeal would lie from an order entered after a permanency plan review hearing where the order continuing the permanency plan did not adversely affect the parental rights or change the terms of the permanency plan to the parent's detriment. In that case, the Circuit Court for Baltimore City previously had implemented permanency plans of adoption for two children, Samone H. and Marchay E., both of whom had been adjudicated children in need of assistance, based upon allegations of neglect by their mother, Katina M. *Id.* at 289, 869 A.2d at 374. After several periodic review hearings, Katina M. filed a request for a "bonding study" to have the children evaluated by a psychiatrist to provide an assessment of her relationship with her children. She also had the children subpoenaed to testify at another pending review hearing. During that hearing, the trial judge denied both requests and maintained the extant permanency plans for adoption, from which Katina M. appealed. On appeal, the Court of Special Appeals affirmed the judgment of the trial court, and this Court after granting certiorari, dismissed the appeal holding that "the trial court's order denying the motion for [bonding] study [was] not an

---

Court of Special Appeals, Ms. B. and Mr. B.'s separate appeals regarding George B. were consolidated, briefed and argued, all of which occurred prior to our recent decision in *In re Samone H.*, 385 Md. 282, 869 A.2d 370 (2005), establishing the requirements of appellate review for judgments arising from permanency plan review hearings.

appealable final judgment and [did] not constitute an interlocutory order under Section 12–303(x)." *Id.* at 316, 869 A.2d at 390.[11]

■ In reaching that conclusion, we explained that the court's order did not constitute a final judgment, and that it was not an appealable interlocutory order "[b]ecause the order continuing the permanency plan did not adversely affect Katina M.'s parental rights or change the terms of the permanency plan to Katina M.'s detriment. . . ." *Id.* at 317, 869 A.2d at 391. We further noted that the court's order was not appealable under the collateral order doctrine because the order did not conclusively determine whether the permanency plans should have been changed, was not separate from the merits of the action, and would be reviewable on appeal if the denial had affected the mother's parental rights adversely. *Id.* at 316 n. 13, 869 A.2d at 390 n. 13. Thus, to be appealable interlocutory orders, court orders arising from the permanency plan review hearing must operate to either deprive the parent of the care and custody of his or her children or change the terms of the care and custody of the children to the parent's detriment. *Id.* at 298, 869 A.2d at 379.; *In re Damon M.*, 362 Md. 429, 438, 765 A.2d 624, 628 (2001).

■ In the present case, both Ms. B. and Mr. B. are appealing orders of the Circuit Court emanating from a permanency plan review hearing that maintained the extant plans for the children but changed the visitation. Clearly, the orders cannot be regarded as final in nature; rather, the orders are interlocutory in nature and must act to detrimentally affect Ms. B. and Mr. B.'s parental rights to be appeal-

---

**11.** Md.Code (1974, 1998 Repl.Vol.) § 12–303(3)(x) of the Court and Judicial Proceedings Article provides:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(3) An order:

\* \* \*

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order. . . .

able under Section 12–303(3)(x) of the Courts and Judicial Proceedings Article. *In re Samone H.* 385 Md. at 299, 869 A.2d at 380; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628.

The hearing judge changed Ms. B.'s visitation with Jessica W. and Mary S. from partial weekly unsupervised visitation to total weekly unsupervised visitation. Obviously, such a change in Ms. B.'s visitation does not operate to her detriment because she is allowed more unrestricted access to the girls. Conversely, the court orders relating to Billy W. and George B., which eliminated Ms. B.'s unsupervised visitation infringes upon Ms. B.'s opportunities to interact with, and care for, the boys and to potentially build stronger relationships with them. Because the orders regarding Billy W. and George B. changed the terms of Ms. B.'s visitation to her detriment, the orders are appealable as interlocutory orders under Section 12–303(3)(x). *See In re Samone H.* 385 Md. at 299, 869 A.2d at 380; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628.

Similarly, the conditions placed on Mr. B.'s visitation with George B., specifically that Mr. B. secure the services of an off-duty officer to supervise his visitation with George B., changed the terms of Mr. B.'s care and custody to his detriment. During the hearing, Mr. B. explained that he did not have "the financial ability to contribute toward things," and his eligibility to be represented by the Office of the Public Defender throughout these proceedings tends to support that assertion. *See In re Adoption/Guardianship Nos. 11387 and 11388,* 354 Md. 574, 587, 731 A.2d 972, 979 (1999) (holding that a natural parent is entitled to representation by Public Defender in hearing conducted to review children's status, as long as that parent is indigent). The court's requirement that Mr. B. hire an off-duty officer with his own resources constitutes a detrimental change in Mr. B.'s visitation rights because the order operates as an effective denial of visitation should he not be able to afford to pay for the officer's services. Therefore, the order qualifies as an appealable interlocutory order. *See In re Samone H.* 385 Md. at 299, 869 A.2d at 380; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628.

## PART I

### Ms. B.'s Appeal

Ms. B. argues that the trial court abused its discretion in admitting hearsay testimony [12] provided by a DSS social worker and two CASAs during the permanency planning hearing because the application of the rules of evidence in such hearings are mandatory despite Maryland Rule 5–101(c),[13] which allows for the discretionary application of the Rules in certain proceedings, including "disposition hearings" under Maryland Rule 11–115 [14] and "modification hearings" under

---

**12.** Maryland Rule 5–801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

**13.** Md. Rule 5–101(c) provides:

(c) **Discretionary application.** In the following proceedings, the court may, in the interest of justice, decline to require strict application of the rules in this Title other than those relating to the competency of witnesses:

(1) The determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 5–104(a);

(2) Proceedings for revocation of probation under Rule 4–347;

(3) Hearings on petitions for post-conviction relief under Rule 4–406;

(4) Plenary proceedings in the Orphans' Court under Rule 6–462;

(5) Waiver hearings under Rule 11–113;

(6) Disposition hearings under Rule 11–115;

(7) Modification hearings under Rule 11–116;

(8) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was authorized to decline to apply the common-law rules of evidence.

**14.** Maryland Rule 11–115 provides in pertinent part:

a. **Hearing—Scheduling.** If after an adjudicatory hearing the court determines that the allegations of the petition at issue in the adjudicatory hearing have been sustained, it shall promptly schedule a separate disposition hearing. The disposition hearing shall be held no later than thirty days after the conclusion of the adjudicatory hearing.

\* \* \*

d. **Commitment to Department of Social Services.** In cases in which a child is committed to a local department of social services for placement outside the child's home, the court, within 18 months after the original placement and periodically thereafter at intervals not greater than 18 months, shall conduct a review hearing to determine whether and under that circumstances the child's commit-

Maryland Rule 11–116.[15] Ms. B. distinguishes permanency planning hearings held under Section 3–823 of the Courts and Judicial Proceedings Article from disposition hearings described under Maryland Rule 11–115d., because, according to her, the determinations made during permanency planning hearings are qualitatively different from those made in disposition hearings as contemplated under Rule 11–115d. Ms. B. also asserts that permanency planning hearings are not modification hearings under Maryland Rule 11–116, characterizing the order issued as a result of a permanency planning hearing as a new order rather than modifying the court's original order.

Conversely, the Department argues that the trial court properly exercised its discretion in admitting the hearsay testimony of the social worker and CASA during the perma-

---

ment to the local department of social services should continue. Considerations pertinent to the determination include whether the child should (1) be returned home, (2) be continued in foster care for a specified period, (3) be placed for adoption, or (4) because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis. The hearing shall be conducted as prescribed in Rule 11–110 or, if conducted by a master, as prescribed in Rule 11–111, except that the child's presence shall not be required if presence at the hearing is likely to cause serious physical, mental, or emotional harm to the child.

15. Maryland Rule 11–116 provides in pertinent part:

a. **Revisory power.** An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public, except in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital.

\* \* \*

c. **Hearing–When required.** If the relief sought under section a of this Rule is for revocation of probation and for the commitment of a respondent, the court shall pass an order to show cause why the relief should not be granted and setting a date and time for a hearing. The clerk shall cause a copy of the petition and Show Cause Order to be served upon the parties. In all other cases, the court may grant or deny the relief, in whole or in part, without a hearing.

d. **Conduct of hearing.** In the interest of justice, at any hearing held pursuant to this Rule the court may decline to require strict application of the rules in Title 5, except those relating to the competency of witnesses.

nency planning hearing because such a hearing is a dispositional hearing, which does not require mandatory application of the Rules of Evidence and permits the juvenile court to decide which rules should apply. The Department notes that the determinations made at a permanency planning hearing are virtually identical to those listed in Rule 11–115d. and that certain evidence may be considered by the court in permanency planning hearings that otherwise would not be admissible, including hearsay testimony by the social workers and the CASAs. According to the Department, because permanency planning hearings are properly considered disposition hearings, "strict application" of the Rules of Evidence is not necessary, and the court did not abuse its discretion in declining to do so.

## Application of the Rules of Evidence in Permanency Planning Hearings

In 1993, this Court adopted Title 5 of the Maryland Rules governing the admission of evidence during judicial proceedings.[16] Specifically, we approved Rule 5–101,[17] which

---

16. This Court's Rules Order of December 15, 1993 stated that "the Rules in Title 5 and the other rules changes hereby adopted by this Court shall govern the courts of this State and all parties and their attorneys in all actions and proceedings therein ...; they shall take effect July 1, 1994 and shall apply in all trials and hearings commenced on or after that date; provided, however, that (1) any trial or hearing commenced prior to July 1, 1994 shall continue to be governed by the law and Rules in effect on June 30, 1994." The language "strict application of the rules of evidence," is derived from the common law governing evidence prior to the enactment of the present Rules under Title 5. *See Woods v. State*, 315 Md. 591, 604, 556 A.2d 236, 242 (1989) (holding that the "strict rules of evidence do not apply at a sentencing proceeding"); *Smith v. State*, 308 Md. 162, 166, 517 A.2d 1081, 1083 (1986) (same); *Town of Somerset v. Montgomery County Board of Appeals et al.*, 245 Md. 52, 65, 225 A.2d 294, 302 (1966) (stating that "proceedings before an administrative board are informal and the strict rules of evidence do not apply").

17. Md. Rule 5–101 states:

(a) **Generally.** Except as otherwise provided by statute or rule, the rules in this Title apply to all actions and proceedings in the courts of this State.

delineates three categories of proceedings based upon the application of the Rules of Evidence. Subsection (a) provides the general rule that the rules of evidence apply to "all actions and proceedings in the courts of this State" subject to certain exceptions. Md. Rule 5–101(a). Subsection (b) lists those proceedings in which the Rules of Evidence do not apply, except "those relating to the competency of witnesses." Md. Rule 5–101(b). Finally, subsection (c), entitled "Discretionary application," contains proceedings, including "Disposition hearings under Rule 11–115d.," in which the court, in its discretion,

(b) **Rules inapplicable.** The rules in this Title other than those relating to the competency of witnesses do not apply to the following proceedings:
(1) Proceedings before grand juries;
(2) Proceedings for extradition or rendition;
(3) Direct contempt proceedings in which the court may act summarily;
(4) Small claim actions under Rule 3–701 and appeals under Rule 7–112(c)(2);
(5) Issuance of a summons or warrant under Rule 4–212;
(6) Pretrial release under Rule 4–216 or release after conviction under Rule 4–349;
(7) Preliminary hearings under Rule 4–221;
(8) Post-sentencing procedures under Rule 4–340;
(9) Sentencing in non-capital cases under Rule 4–342;
(10) Issuance of a search warrant under Rule 4–601;
(11) Detention and shelter care hearings under Rule 912; and
(12) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was traditionally not bound by the common-law rules of evidence.
(c) **Discretionary application.** In the following proceedings, the court may, in the interest of justice, decline to require strict application of the rules of evidence in this Title other than those relating to the competency of witnesses:
(1) The determination of questions of fact preliminary to admissibility of evidence when the issue to be determined by the court under Rule 5–104(a);
(2) Proceedings for revocation of probation under Rule 4–347;
(3) Hearings on petitions for post-conviction relief under Rule 4–406;
(4) Plenary proceedings in the Orphan's Court under Rule 6–462;
(5) Waiver hearings under Rule 913;
(6) Disposition hearings under Rule 915;
(7) Modification hearings under Rule 916; and
(8) Any other proceeding in which, prior to the adoption of the rules in this Title, the court was authorized to decline to apply the common-law rules of evidence.

may decline to apply the Rules of Evidence. Md. Rule 5–101(c).

In the present case, Ms. B. presents arguments similar to those of the petitioner in *In re Ashley E., Laione D., Matthew B., and Gregory B.-G.*, 387 Md. 260, 874 A.2d 998 (2005). Specifically, Ms. B. contends that disposition hearings under Rule 11–115d. are distinct from permanency planning hearings under Section 3–823 of the Courts and Judicial Proceedings Article, and therefore, under Rule 5–101, the juvenile court is required to strictly apply the Rules of Evidence in permanency planning hearings. To that end, she emphasizes that there are different determinations that the court must make under Section 3–823 of the Courts and Judicial Proceedings Article as compared to what the court must accomplish to comply with the requirements under Rule 11–115d.[18]

In *In re Ashley E.*, we rejected those arguments and held that permanency planning hearings are dispositional in nature and are properly characterized as disposition hearings under Rule 11–115d. As such, we concluded that "the court may, in the interest of justice, decline to require strict application" of the Rules of Evidence "other than those relating to the competency of witnesses." *Id.* at 294, 874 A.2d at 1019.

We find our holding in *In re Ashley E.*, to be dispositive of Ms. B.'s arguments. Therefore, under *In re Ashley E.*, the juvenile court in the case *sub judice*, could, in the interest of justice, decline to require strict application of the Rules of

---

Md. Rule 5–101 (1994).

**18.** Alternatively, Ms. B. argues that permanency planning hearings do not fall under the catchall provision, 5–101(c)(8), that applicable to "[a]ny other proceeding in which, prior to the adoption of the rules in this Title, the court was authorized to decline to apply the common-law Rules of Evidence." She contends that there were no provisions for permanency plan hearings prior to the adoption of the Rules of Evidence, and therefore, the catchall provision is inapplicable. Because we have concluded that permanency planning hearings are properly characterized as disposition hearings under Rule 11–115, we do not reach the issue of whether permanency planning hearings qualify under the 5–101(c)(8). *See In re Ashley E.*, 387 Md. at 294, 874 A.2d at 1019.

Evidence, other than those relating to the competency of witnesses. *Id.* at 294, 874 A.2d at 1019; Md. Rule 5–101(c).

## Admissibility of Hearsay Testimony in Permanency Planning Hearings

In the present case, we are called upon to address the criteria that should be utilized by the trial court to determine the admissibility of hearsay evidence in permanency planning hearings after we have declined to require strict application of the Rules of Evidence. Although this specific issue is one of first impression in this Court, we have had the opportunity to evaluate the criteria for admissibility of evidence when the evidentiary rules do not "strictly apply" in sentencing hearings and administrative proceedings. *See Whittlesey v. State,* 340 Md. 30, 71–72, 665 A.2d 223, 243 (1995) (noting that although "the strict Rules of Evidence do not apply at a sentencing proceeding .... [this] does not require the admission of unreliable evidence"); *Baker v. State,* 332 Md. 542, 558, 632 A.2d 783, 790 (1993) (stating that "while the strict Rules of Evidence do not apply at a sentencing proceeding, unreliable hearsay is inadmissible"); *State v. Dopkowski,* 325 Md. 671, 680, 602 A.2d 1185, 1190 (1992) (same); *Woods,* 315 Md. at 604, 556 A.2d at 242 (same); *Smith,* 308 Md. at 166, 517 A.2d at 1083 (same); *Gorin v. Board of County Commissioner for Anne Arundel County et al.,* 244 Md. 106, 110, 223 A.2d 237, 239 (1966) (stating "[w]hile proceedings before an administrative board are informal and the strict Rules of Evidence do not apply .... [o]ne of the requisites in such a proceeding is that the party who carries the burden of proving an issue adduce substantial evidence of probative value").

Similarly, our colleagues on the Court of Special Appeals have explored the standards for admitting evidence when the Rules of Evidence do not strictly apply. *See In re Delric H.,* 150 Md.App. 234, 248–49, 819 A.2d 1117, 1126 (2003) (holding that "even though a court may decline to require a strict application of evidentiary rules [in juvenile restitution hearings], there still exists an inherent reliability/credibility requirement which a proponent of the offered evidence must

satisfy"). *See also Prince George's County v. Hartley,* 150
Md.App. 581, 595, 822 A.2d 537, 545 (2003), quoting *Travers v.
Baltimore Police Dep't,* 115 Md.App. 395, 693 A.2d 378 (1997)
(holding that the Rules of Evidence are relaxed in administra-
tive proceedings; however, the evidence adduced "must dem-
onstrate sufficient reliability and probative value to satisfy the
requirements of procedural due process"); *Kitchen v. State,* 87
Md.App. 299, 303, 589 A.2d 575, 577 (1991) (determining that
"in probation revocation proceedings formal Rules of Evidence
are not applied, and that *reasonably reliable* hearsay may be
received") (emphasis added).

Consistent with this view, several of our sister states have
held that in juvenile proceedings in which rules of evidence are
not strictly applied, admissibility of evidence must be based
upon reasonable indicia of reliability and trustworthiness. *See
In re C.J.,* 328 Ill.App.3d 103, 262 Ill.Dec. 36, 764 N.E.2d 1153,
1160 (2002) (stating that in a juvenile proceeding the formal
rules of evidence are relaxed and that "all evidence shall be
admissible if it is relevant and reliable"); *In re Sara M.,* 194
Cal.App.3d 585, 239 Cal.Rptr. 605, 611 (1987) (finding that the
"rules of evidence are relaxed in dependency proceedings but
expert evidence not shown to be reliable ... remains inadmis-
sible").

Similarly, state courts addressing administrative proceed-
ings in which the rules of evidence are relaxed have held that
the evidence to be admitted must possess some degree of
reliability and trustworthiness. *See e.g., Alix v. E–Z Serve
Corporation,* 846 So.2d 156, 159 (La.App.2003) (holding that in
"workers' compensation matters, the technical rules of evi-
dence are relaxed, but findings must nonetheless be based on
'competent evidence'" which is "evidence [that] has some
degree of reliability and trustworthiness and is of the type
that reasonable persons would rely upon"); *New London
Housing Authority v. State Board of Labor Relations,* 47
Conn.Supp. 624, 820 A.2d 332, 338 (2001) (noting that in
administrative proceedings the rules of evidence are relaxed
and that the court may consider any materials that are
reliable and probative); *Bean v. Montana Board of Labor*

*Appeals*, 290 Mont. 496, 965 P.2d 256, 260 (1998) (determining that although the rules of evidence are more relaxed in an administrative proceeding than in a court of law, the evidence adduced must be reliable and probative).

█ Addressing the specific issue before us, we conclude that in permanency planning hearings when the Rules of Evidence are not strictly applied, the trial court must evaluate whether evidence proffered for admission is sufficiently reliable and probative prior to its admission.

█ Ms. B. contends that the trial court should have sustained her objections to portions of the testimony of the DSS social worker, Ms. Caceres, which contained hearsay statements.[19] During the May 5, 2004 hearing, the trial judge admitted the testimony of Ms. Caceres, who stated that as a part of her duties, she was charged with gathering information to make determinations and recommendations to the court concerning the best interests of the children. *See* Md.Code (1984, 1999 Repl Vol.), § 5–525 of the Family Law Article. Ms. Caceres testified about Ms. B.'s conduct and conversations during visits with the children, the children's feelings toward Ms. B., and the children's behavior following visits with Ms. B. Ms. Caceres's testimony also included statements concerning the progress of the children's therapy sessions based upon information provided by the psychologist conducting the therapy sessions. Most of the information that Ms. Caceres conveyed to the court was related to her direct observations of both parents and the children. Therefore, we conclude that Ms. Caceres' testimony was sufficiently reliable and probative based upon her responsibilities and opportunity to observe both parents and the children.

## Court Appointed Special Advocates

Ms. B. also urges this court to determine that the trial court improperly admitted the testimony of the CASA volunteers

---

19. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5–801(c).

during the hearing. The present case involves the use of CASAs in a juvenile proceeding, which previously has not been addressed by this Court or the Court of Special Appeals. Therefore, a discussion of CASAs and their role in such proceedings is warranted.

Because of growing concern regarding the lack of quality legal representation for abused and neglected children, in 1974 the Child Abuse Prevention and Treatment Act ("CAPTA"), was enacted by Congress. It required that "in every case involving an abused or neglected child which results in a judicial proceeding a guardian ad litem shall be appointed to represent the child in such proceedings." Pub.L. No. 93–247, § 4(b)(2)(G), 88 Stat. 4 (1974), codified as 42 U.S.C. §§ 5101–5107 (1994). In response to CAPTA's mandate, Judge David Soukup, a Superior Court Judge in Seattle, Washington, introduced the concept of utilizing volunteers to act as guardian ad litems ("GAL")[20] for children in abuse and neglect cases, and in 1977, began a child advocacy program called Court Appointed Special Advocate ("CASA"). A CASA has been described as "a trained community volunteer, appointed by a judge, to represent the best interests of children in cases that come before the court due to alleged abuse or neglect." NATIONAL COURT APPOINTED SPECIAL ADVOCATE ASSOCIATION, JUDGE'S GUIDE TO CASA/GAL PROGRAM DEVELOPMENT [hereinafter "NCASAA JUDGE'S GUIDE"] 15 (2004).

In 1982, a National Court Appointed Special Advocate Association [hereinafter "NCASAA"] was established to create

---

**20.** In *Goldberg v. Miller*, 371 Md. 591, 607 n. 4, 810 A.2d 947, 956 n. 4 (2002), this Court discussed the traditional role that guardians *ad litem* play for children in Maryland:

> When the court appoints an attorney to be a guardian ad litem for a child, the attorney's duty is to make a determination and recommendation after pinpointing what is in the best interests of the child. The attorney who assumes the traditional guardian ad litem role has a responsibility primarily to the court and therefore has absolute immunity for "judicial functions," which include testifying and making reports and recommendations. This more traditional role is defined by the court and the attorney looks to the court for direction and remuneration.

*Id.* (citation and footnote omitted).

uniform standards for newly formed as well as expanding state programs. Thereafter, in 1990, Congress enacted the Victims of Child Abuse Act, which endorsed CASA programs and called for expanding the utilization of CASA volunteers by making them available to every victim of child abuse or neglect. *See* 42 U.S.C. §§ 13011–13014 (1994). In addition, the Act provides federal funds to develop statewide CASA programs and establishes criteria that a program requesting funds must meet to qualify. Victims of Child Abuse Act of 1990, Pub.L. No. 101–647, § 211. The statute requires, in part:

1. A CASA association must have a mission and purpose in keeping with the National CASA Association and that it abide by the National CASA Association Code of Ethics;

2. A CASA program must operate with access to legal counsel;

3. The management and operation of a CASA program must assure adequate supervision of court appointed special advocate volunteers;

4. A CASA program must keep records on the operation of the program in general, and on each appellant, volunteer and case;

5. A CASA program must have written management and personnel policies and procedures, screening requirements, and training curriculum;

6. A CASA program will not accept volunteers who have been convicted of, or have charges pending for, or have in the past been charged with, a felony or misdemeanor involving a sex offense, violent act, child abuse or neglect, or related acts that would pose risks to children or to the CASA program's credibility;

7. A CASA program must have established procedures to allow the immediate reporting to a court or proper agency of a situation in which a CASA volunteer has reason to believe that a child is in imminent danger;

8. A CASA volunteer must be an individual who has been screened and trained by a recognized CASA program and

appointed by the court to advocate for the children who come before the court system primarily as a result of abuse or neglect; and

9. A CASA volunteer serves the function of reviewing records, facilitating prompt, thorough review of cases, and interviewing appropriate parties in order to make recommendations on what would be in the best interest of the child.

Victims of Child Abuse Act of 1990, Pub.L. No. 101–647, § 211.

CASA programs provide training for community volunteers to advocate for the best interests of children who come into the court system primarily as a result of alleged abuse or neglect. *See* STANDARDS FOR NATIONAL CASA ASSOCIATION MEMBER PROGRAMS [hereinafter NCASAA STANDARDS] 1 (2002). The programs also ensure that volunteers have regular, in-person contact with the child sufficient to have a working knowledge of the situation and to make factual recommendations to the court. *See* NCASAA STANDARDS at 1. According to NCASAA's Standards for National CASA Association Member Programs, each CASA volunteer receives training consisting of approximately thirty hours of instruction, conducted by the local CASA program. *Id.* at 22. NCASAA recommends that CASA volunteers receive instruction in topics such as child sexual abuse, early childhood development, adolescent behavior, and advocacy techniques. *Id.* The NCASAA Standards require that CASAs should receive instruction in courtroom procedure from the principals in the system, *ie.*, judges, attorneys, social workers, and court personnel. *Id.*

According to the NCASAA Judge's Guide to CASA Program Development, a CASA volunteer, as a part of his or her duties, should:

1. **Conduct an independent investigation** by reviewing all pertinent documents and records and interviewing the child, parents, social workers, foster parents, teachers, therapists, daycare providers and other relevant persons to determine the facts and circumstances of

the child's situation. To do this effectively, volunteers spend considerable time getting to know children and gaining their trust.

2. **Determine the thoughts and feelings of the child about the situation,** taking into account the child's age, maturity, culture and ethnicity and degree of attachment to family members, including siblings. Also to be considered are continuity, consistency and a sense of belonging and identity.

3. **Seek cooperative solutions** by acting as a facilitator and mediator among conflicting parties to achieve resolution of problems and to foster positive steps toward achieving permanence for the child.

4. **Provide written reports at every hearing** which include findings and recommendations. The report documents the extent of the volunteer's investigation, lists each source of information and includes sufficient facts to justify the recommendations.

5. **Appear at all hearings** to advocate for the child's best interests and provide testimony when necessary.

6. **Explain the court proceedings and the role of the CASA volunteer to the child** in terms the child can understand.

7. **Make recommendations** for specific, appropriate services for the child and the child's family and advocate for necessary services which may not be immediately available.

8. **Monitor implementation of case plans and court orders,** checking to see that court-ordered services are implemented in a timely manner and that review hearings are held in accordance with the law.

9. **Inform the court promptly of important developments** including any agency's failure to provide services or the family's failure to participate. The CASA volunteer should ensure that appropriate motions are filed on behalf of the child in order that the court can

be made aware of the changes in the child's circumstances and can take appropriate actions.

10. **Advocate for the child's interests in the community** by bringing concerns regarding the child's health, education and mental health, etc. to the appropriate professionals to assure that the child's needs in these areas are met.

NCASAA JUDGE'S GUIDE at 17. Moreover, CASA volunteers may be subject to dismissal for having taken action without program or court approval that endangers the child or outside the role or purview of the CASA program. The service of CASA volunteers also may be terminated for engaging in an ex parte communication with the court; violating a program policy, court rule, or the law; failing to complete required training or to carry out effectively his or her assigned duties; or if allegations of abuse or neglect are brought against the CASA. *See* NCASAA STANDARDS at 25.

To date, there is at least one CASA program in each of the fifty states, and the majority of states also have enacted statutes establishing CASA programs and defining the role that the CASA volunteers play in child abuse and neglect cases. Many state courts have sanctioned the use of CASA volunteers and have allowed them to submit reports and recommendations, as well as testify regarding their findings. *See e.g., In re K.L.S.,* 94 P.3d 1025 (Wyo.2004); *In re T.H.,* 131 S.W.3d 598 (Tex.App.2004); *In re R.A.R.,* 259 Ga.App. 680, 577 S.E.2d 872 (2003); *Arkansas Dept. of Human Services v. Collier,* 351 Ark. 506, 95 S.W.3d 772 (2003); *In re D.F.,* 201 Ill.2d 476, 268 Ill.Dec. 7, 777 N.E.2d 930 (2002); *In re W.B.,* 772 N.E.2d 522 (Ind.App.2002); *In re J.W.,* 111 Wash.App. 180, 43 P.3d 1273 (2002); *In re A.T.H.,* 37 S.W.3d 423 (Mo.App.2001); *Div. Family Services v. Hutton,* 765 A.2d 1267 (Del.Supr.Ct.2001); *Adoption of Georgia,* 433 Mass. 62, 739 N.E.2d 694, 699–700 (2000); *In re Samantha M.,* 205 W.Va. 383, 518 S.E.2d 387, 390–91 (1999); *Adoption of Tina,* 45 Mass.App.Ct. 727, 701 N.E.2d 671, 676 (1998); *In Interest of N.M.,* 528 N.W.2d 94 (Iowa 1995); *In re Autumn H.,* 27 Cal.App.4th 567, 32 Cal.Rptr.2d 535 (1994). In particular,

CASA volunteers have testified about the family dynamics among the parent, child, and foster-parents and the extent of the services being offered to accommodate the child's needs, and have provided recommendations to the court regarding the appropriate placement for the child. *See e.g., In re A.C.O.,* 269 Ga.App. 667, 605 S.E.2d 77 (2004); *Fresno County Dept. Children & Fam. Services v. Superior Court,* 122 Cal.App.4th 626, 19 Cal.Rptr.3d 155 (2004); *In re J.P.,* 268 Ga.App. 32, 601 S.E.2d 409 (2004); *In re Tara P.,* 836 A.2d 219 (R.I.2003); *In re E.M.,* 810 So.2d 596 (Miss.2002); *Larscheid v. Arkansas Dept. of Human Services,* 343 Ark. 580, 36 S.W.3d 308 (2001); *In re Adoption of C.D.,* 313 Ill.App.3d 301, 246 Ill.Dec. 180, 729 N.E.2d 553 (2000); *Padilla v. Norfolk Div. of Social Services,* 22 Va.App. 643, 472 S.E.2d 648 (1996); *Matter of Gail,* 417 Mass. 321, 629 N.E.2d 1308 (1994).

The mechanisms by which the programs operate, however, differ among the states. Most states have general statutes that establish CASA programs by defining the program's purpose and setting forth how the program is to be administered, including funding, training, selection, and supervision of the CASA volunteers, but do not define the role of CASA volunteers in juvenile and family proceedings beyond a generic description of those duties and responsibilities.[21] These states utilize informal ways of integrating CASA volunteers into the judicial process by allowing the CASA program to formulate its own guidelines, procedures, and policies related to the

---

**21.** *See* AK. STAT. § 44.21.460 (1988); FLA. STAT. ANN § 39.807 (1990); GA.CODE ANN. § 15–11–9 (1986); 705 ILL. COMP STAT. ANN. 405/2–17.1 (1993); IND.CODE ANN. § 31–9–2–28 (1997); ME.REV STAT. ANN. TITLE 22 § 4005 (1985); MD.CODE (1989), § 3–830 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE; MICH. CT Rule 3.917 (2003); MINN. CT. RULE 26.01 (2003, 2005 Supp.); MO. ANN. STAT. § 476.777 (2001); MONT CODE ANN. § 41–3–1013 (1993); N.H.REV.STAT. ANN. § 490–C:6 (2002); N.J. CT. RULE 5:8C (1998); N.M. STAT. ANN. § 32A–1–4 (1993) AND N.M. CT RULE 10–121 (1995); N.Y. SOCIAL SVCS. LAW § 392 (2004 Cum.Supp.); OHIO R FRANKLIN JUV. CT. RULE 4 (1990); OKLA. STAT. ANN. TITLE 10 § 1211 (1989); 34 OR REV.STAT. §§ 419A.004, 419A.170 (1993); R.I. GEN. LAWS § 40–11–7 (1990); S.C.CODE ANN. §§ 20–7–121 (1988); S.D. CODIFIED LAWS § 16–2–51 (2003); TENN.CODE ANN. §§ 37–1–149 (1990); UTAH CODE ANN. § 78–3a–912 (1994); WASH CODE ANN. § 13.34.030(8), 13.34.102 to-.107 (2000); W.V. CT. RULE OF PRO. FOR CHILD ABUSE AND NEGLECT 52 (1997).

scope of the CASA's duties. In these instances, there is no statute or court rule that enumerates the extent of a CASA volunteer's involvement in the judicial process.

Conversely, approximately fourteen states have formal mechanisms that are statutorily-mandated for defining the scope of a CASA volunteer's responsibilities in juvenile proceedings.[22] For example, the State of California has a comprehensive statutory scheme that sets forth the requirements a CASA program must follow to be recognized and specifically defines the CASA volunteer's duties to include interviewing and observing the parties involved in the case, reviewing relevant records and reports, filing a report with the court, and monitoring cases assigned to the volunteer by the judge. *See* CAL. WELF. & INST.CODE § 100–104 (1988).

Similarly, the State of Colorado has a statutory scheme that enumerates the duties and responsibilities of a CASA volunteer, which include: conducting independent investigations regarding the child, providing factual background information to the court in the form of a report, interviewing relevant individuals, reviewing records, making recommendations to the court, and testifying in court proceedings. *See* COLO.REV. STAT. ANN. § 13–91–105 (2000).

Other state statutes have allowed CASA volunteers a more expansive role in advocating for the child. In those instances, the CASA volunteer is permitted to participate in depositions, negotiations, discovery, pretrial conferences, hearings, and appeals. *See e.g.,* ARIZ.REV.STAT. ANN. §§ 8–522 to 523 (1991);

---

**22.** *See* ARIZ.REV.STAT. ANN. §§ 8–522 to 523 (1991); ARK CODE ANN §§ 9–27–316 (1989); CAL. CT. RULE 1424 (1994, 2005 SUPP.) AND CAL. WELF. & INST.CODE ANN. §§ 102–104 (1998); COLO.REV.STAT. ANN. § 13–91–10518–3–412.5 (2000) AND COLO.REV.STAT. ANN. §§ 19–1–111.5, 19–1–112 (1996); DEL.CODE ANN. TIT. 31 § 3603 to 3617 (1995); IOWA CODE ANN. §§ 232.89, 232.126 (1987); KAN. STAT. ANN. 38–1606A. (1994) AND KAN. DIST. CT. RULE 110. (1986); KY.REV.STAT. ANN §§ 620.515 to-.525 (1990); LA CODE JUV PROC. ANN. art. 424 (1991, 2005 Supp.); NEB.REV.STAT. §§ 43–272.02, 43–3701 to 43–3716 (2000); NEV. CT. RULE 5.69 (2000); 42 PA CONS.STAT. ANN. §§ 6302, 6342 (1998); VA.CODE ANN. § 9.1–151 to –157 (2001); WIS. STAT. ANN. § 48.236 (1999).

DEL.CODE ANN. TIT. 31, § 3603–3610 (2000); KAN. STAT. ANN. 38–1606a. (1994).

In Maryland, the Court–Appointed Special Advocate Program was enacted to establish the use of CASAs in juvenile proceedings. *See* 1989 Md. Laws, Chap. 641. The statute has not changed substantively since its enactment and was recodified as Maryland Code (1989, 2002 Repl.Vol.), § 3–830 of the Courts and Judicial Proceedings Article, in 2001.[23] The Maryland CASA Program is county-oriented and is dependent on court[24] appointment of trained volunteers whose primary pur-

---

**23.** Md.Code (1989, 2002 Repl.Vol.), § 3–830 of the Courts and Judicial Proceedings Article, states:

(a) *Definitions.*—(1) In this section the following words have the meanings indicated.

(2) "Advocate" or "C.A.S.A." means a Court–Appointed Special Advocate.

(3) "Program" means a Court–Appointed Special Advocate service that is created in a county with the support of the court for that county to provide trained volunteers whom the court may appoint to:

(i) Provide the court with background information to aid it in making decisions in the child's best interest; and

(ii) Ensure that the child is provided appropriate case planning and services.

(b) Established; purpose; administration; rules.—(1) There is a Court–Appointed Special Advocate Program.

(2) The purpose of the Program is to provide volunteers whose primary purpose is to ensure that children who are the subject of a CINA proceeding are provided with appropriate service and case planning that is in their best interest.

(3) The Administrative Office of the Courts:

(i) Shall administer the Program;

(ii) Shall report annually to the Chief Judge of the Court of Appeals and, subject to § 2–1246 of the State Government Article, to the General Assembly regarding the operation of the Program; and

(iii) May adopt rules governing the implementation and operation of the Program including funding, training, selection, and supervision of volunteers.

(c) *Funding.*—The Governor may include funds in the budget to carry out the provisions of this section.

(d) *Liability.*—An advocate or a member of the administrative staff of the Program is not liable for an act or omission in providing services or performing a duty on behalf of the Program, unless the act or omission constitutes reckless, willful, or wanton misconduct or intentionally tortious conduct.

**24.** "Court" under this subtitle "means the circuit court for a county

pose is to ensure that children who are the subject of a CINA proceeding are afforded appropriate services and case planning that is in their best interests. *See* Md.Code, § 3–830(a)(3) and (b)(2) of the Courts and Judicial Proceedings Article.

Maryland's CASA statute provides a generic description of a CASA volunteer's responsibilities and functions in a juvenile proceeding. According to the statute, a court may appoint a CASA volunteer to "[p]rovide the court with background information to aid it in making decisions in the child's best interest; and to [e]nsure that the child is provided appropriate case planning and services." Md.Code, § 3–830(a)(3) of the Courts and Judicial Proceedings Article. Rather than explicitly outlining the duties and responsibilities of CASA volunteers, the statute authorizes the Administrative Office of the Courts to "adopt rules governing the implementation and operation of the Program including funding, training, selection, and supervision of volunteers." Md.Code, § 3–830(b)(3)(iii) of the Courts and Judicial Proceedings Article.

The Guidelines adopted by the Administrative Office of the Courts in 1989 dictate how the CASA programs are to be structured and operated, the requirements for volunteer training and supervision, and the funding requirements for the programs. *See* ADMINISTRATIVE OFFICE OF COURTS CASA RULES AND GUIDELINES [hereinafter "AOC CASA GUIDELINES"], 1 (2004). The Guidelines describe the role of the CASA volunteer:

> The CASA volunteer is considered a Friend of the Court and does not have party status. The volunteer is considered an agent of the court and is appointed at the judge's discretion to represent the child's best interests. Volunteers are not represented by an attorney but should be provided access to legal counsel by the program.

sitting as the juvenile court." Md.Code (1973, 2002 Repl.Vol.) § 3–801 of the Courts and Judicial Proceedings Article.

AOC CASA GUIDELINES at 1. The Guidelines also define the responsibilities of a CASA volunteer, those being: to review the case history and juvenile court file; to meet with the CASA staff to develop a case plan; to schedule and attend appointments with relevant parties; to complete required CASA forms and documentation; to maintain the confidentiality of any and all information received on behalf of the child; and to submit a written report to the court. *See* AOC CASA GUIDELINES at 4.

■ CASA volunteers have been permitted to testify in court proceedings and submit recommendations relating to child placement. *See e.g., In re Justin D.,* 357 Md. 431, 438, 745 A.2d 408, 412 (2000) (permitting CASA volunteer to recommend during a permanency planning review hearing that child's permanency plan should remain one of long-term foster care). We are called upon here to delineate the boundaries for testimony by a CASA volunteer in a permanency planning hearing.

During the hearing in the case *sub judice,* the trial court, *sua sponte,* called the CASA volunteers assigned to the case by the Circuit Court to testify during the hearing. Each CASA volunteer then testified, while not under oath, about statements made by the children and the children's foster-mother in addition to clarifying certain factual statements made in a report submitted to the court and reviewed by the parties. The CASAs' testimony primarily consisted of statements made by the children expressing their feelings toward Ms. B. and the children's behavior following visits with Ms. B. The CASAs conveyed facts to the court that were based upon their direct observations of the children and meetings with the foster-mother. As such, we conclude that the testimony provided by each CASA volunteer was reliable and probative of the issues relating to the children.

■ Although we have stated previously, that the court may, in the interest of justice, decline to require strict application of the Rules of Evidence, it must strictly adhere to rules relating to the competency of witnesses. *See In re Ashley E.,*

387 Md. at 294, 874 A.2d at 1019 (holding that in permanency planning hearings "the court may, in the interest of justice, decline to require strict application of the rules of evidence other than those relating to the competency of witnesses"), quoting Md. Rule 5–101(c). One competency requirement is contained in Maryland Rule 5–603, which states:

> Before testifying, a witness shall be required to declare that the witness will testify truthfully. The declaration shall be by oath or affirmation administered either in the form specified by Rule 1–303 or, in special circumstances, in some other form of oath or affirmation calculated to impress upon the witness the duty to tell the truth.

In this instance, the trial judge required each witness, except the CASAs, to take an oath prior to testifying at the permanency planning hearing, including the social workers who testified. Clearly, the CASA volunteers should have been required to comply with the dictates of Rule 5–603, but the omission of such was waived in the present case when the parties failed to object on this basis. *See Perry v. State,* 381 Md. 138, 848 A.2d 631 (2004), in which we held that, "[i]f incompetency is not known when the witness is called, an objection should be made as soon as the incompetency becomes apparent. Otherwise the objection is waived." *Id.* at 146 n. 4, 848 A.2d at 636 n. 4. *See also Schaefer v. Cusack,* 124 Md.App. 288, 313, 722 A.2d 73, 86 (1998) (holding that "objection to a witness's testifying who has not made an oath or affirmation will be considered waived unless made before the testimony or, if the witness is not on the stand as soon as it should be apparent that the witness is testifying").

▮ Ms. B. further argues, however, that the trial judge improperly admitted hearsay testimony of the CASAs because she did not have an adequate opportunity to cross-examine the CASAs during the permanency planning hearing. CASAs, when they testify in permanency planning review hearings, must be subject to cross-examination, as any other witness. *See Mayor and Council of Rockville v. Woodmont Country Club,* 348 Md. 572, 582, 705 A.2d 301, 306 (1998) (holding that

in administrative proceedings the parties have a right to reasonable cross-examination of witnesses); *Imperial v. Drapeau*, 351 Md. 38, 716 A.2d 244 (1998) (determining that in administrative proceedings the parties must be afforded an opportunity to cross-examine the witnesses); *Town of Somerset*, 245 Md. at 66, 225 A.2d at 302 (holding that in administrative proceedings "[a]ll parties must be fully apprised of the evidence submitted or to be considered, and must be given the opportunity to cross-examine witnesses"). This issue, however, was not preserved by sufficient objection at the trial court level, so that we do not have occasion to review it.

HARRELL, J. as to Part II, joined by RAKER, WILNER, and GREENE, JJ.

## PART II

### Mr. B's Appeal

The Court is divided as to the proper disposition of Mr. B's appeal. Thus, the Court's opinion is serialized, of necessity.

Mr. B. asserts that the trial court abused its discretion in maintaining the extant permanency plan and supervised visitation of one visit per month, with George B., neither of which is appealable under our decision in *In re Samone H.*, 385 Md. at 316, n. 13, 869 A.2d at 390, n. 13. Judge Battaglia, for the Court, disposed of this issue in Part I of the Court's opinion. Mr. B. also argues that the Circuit Court erred in requiring him to pay for off-duty law enforcement to supervise the visitations with George B., inasmuch as such a condition operated to eliminate virtually his visitation with George B. because of Mr. B.'s claimed indigence.

DSS argues that the trial court properly exercised its discretion in maintaining the permanency plan and imposing the added condition on Mr. B.'s future visitations. In support of its contention, DSS notes that the trial court's requirement that Mr. B. hire an officer to monitor the visitation was warranted, given Mr. B.'s past history of sexual abuse and inability to control himself during a prior visit with George B.

Decisions concerning visitation generally are within the sound discretion of the trial court, and are not to be disturbed unless there has been a clear abuse of discretion. *In re Yve S.,* 373 Md. 551, 566–67, 819 A.2d 1030, 1039 (2003); *In re Mark M.,* 365 Md. 687, 705–06, 782 A.2d 332, 343 (2001). The court must decide and set forth the "minimal amount of visitation that is appropriate and that DSS must provide, as well as any basic conditions that it believes, as a minimum, should be imposed." *In re Justin D.,* 357 Md. 431, 450, 745 A.2d 408, 418 (2000). Because the trial court is required to make such determinations in the best interests of the child, visitation may be restricted or even denied when the child's health or welfare is threatened. *In re Yve S.,* 373 Md. at 566–67, 819 A.2d at 1039; *In re Mark M.* 365 Md. at 705–06, 782 A.2d at 343. Where the child has been declared a child in need of assistance because of abuse or neglect, the trial court is constrained further by the requirements of Section 9–101 of the Family Law Article when setting the conditions of visitation. Section 9–101 states:

(a) *Determination by court.*—In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(b) *Specific finding required.*—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

Md.Code (1974, 1999 Repl.Vol.), § 9–101 of the Family Law Article.

Thus, when a court has reasonable grounds to believe that neglect or abuse has occurred, as did the court in this case, custody or visitation must be denied, except for super-

vised visitation, unless the court makes a specific finding that there is no likelihood of further abuse or neglect. *In re Yve S.*, 373 Md. at 566–67, 819 A.2d at 1039. If the court determines, as an exception, that supervised visitation is appropriate, the court must assure, at a minimum, that such visitation will not jeopardize the safety and well-being of the child.

As a part of our review of the present case, we must scrutinize the factual findings of the juvenile court. The juvenile judge's findings with respect to Mr. B.'s visitation with George B. during the hearing, and in support of her subsequent order, were as follows:

Mr. B. is—I mean, the argument to me, essentially, is that he is not at risk of abusing his child, and therefore, the plan should be reunification with Ms. B., and his contacts should be unsupervised.

This difficulty that I have with the argument is the following: Mr. B. has acknowledged, and I credit his candor, but he has acknowledged sexually abusing three children.

\* \* \*

The ripple and collateral affect of that have been tremendous. And the problem with abuse is that it's not simply the abuse on the direct victim, but the lies and the cover-ups, and the ripples throughout the family that are just incredibly long-lasting, and they have tremendous impacts on children. And this case, if nothing else, points to that.

The fact that Mr. B. would not sexually abuse his own child does not answer the question of whether it would be appropriate for him to be the person who should have parenting responsibility for the child; because the failures and lapses in judgment that were part and parcel of the problems surrounding the abuse, while being addressed at some extent in therapy, they still exist.

And the other piece of that is that Mr. B. has demonstrated issues in anger management that are not insignificant. He is addressing those also therapeutically.

I commend his candor on the stand and the fact that he is extremely dedicated to do the things that he is required to do in therapy and on probation. There is still a lot of work to be done.

The difficulty is, the thing that's the sole focus of the anger right now is this case. It completely undermines his ability to work with the Department or to accept the opinions or views of others if they run counter to what he thinks.

And that has been demonstrated in recent contacts at the Department and with the social workers, the most recent one giving rise to an incident involving police officers, whose view of what happened that day I found far more credible than Mr. B. I don't think he intentionally—I just think that he sees the world in very different ways.

\* \* \*

The question as to visits for Mr. B. is complicated by the fact that ... I would not burden the Department with supervising visits if the Department's agents didn't reasonably feel that they were safe in his presence or felt threatened in his presence.

But, they do feel threatened in his presence, and I think there is demonstrable reason for that. I still, though have the difficulty of whether the child should have some contact with his father, and I am truly struggling with that.

Mr. B. is working right now and he has some financial ability to contribute towards things.

[MR. B]: I don't.

[THE COURT]: Well, that's going to be a problem for you.

[MR. B.]: In a few months. Right now I'm paying a lot. My medical benefits are cut off and there are probationary requirements.

[THE COURT]: Mr B., now is not the time for you to be speaking.

To the extent that I would permit visits to continue it would only be done with an outside monitor in place and in a neutral site.

It is my understanding that some of the sheriffs that are off duty will monitor supervised visitation and they'll do it at a fee.

I am advising [Mr. B.'s Counsel] of that, that I would consider a proposal for supervised visits by an outside monitor who is an off-duty law enforcement person, but it's going to be at Mr. B.'s expense.

[MR. B.'S COUNSEL]: Your Honor, if the Young Fathers/Responsible Fathers program that Mr. H. represents, if they have a function like that, or a program like that, would that be acceptable?

[THE COURT]: I want it to be something that I have very tight controls over, for what the parameters are for the visitation, because, quite frankly, Mr. B. will push the bounds of whatever I set, so I'm not sure that I am going to go with a program like that.

I would allow an outside supervisor who would be an off-duty police officer who would be doing one-on-one supervision, and do it, again, as a monthly visit.

It will be at his expense, and it will be his burden to come up with a plan for it, because he forfeited the right to have the Department supervise it as a function of his own behavior and conduct in visits, and I found the evidence on that to be overwhelmingly credible.

So, I'm not going to have social workers feeling at risk in his presence. When visits were going smoothly, they don't. As soon as anything happens, when it doesn't go the way he thinks that it should be, they have felt threatened, and I find reasonably so, and in fact he acted out with a police officer, with several officers. So, that would be the restriction on the visitation.

■ Based upon the judge's findings, there were reasonable grounds to believe that a child had been abused by Mr. B. because of Mr. B.'s acknowledgment to the court that previ-

ously he abused three children. We have held that neglect or abuse of a child in the past refers to the abuse or neglect of *any* child in the past, not only the child at issue in the current proceeding. *See In re Adoption No. 12612,* 353 Md. 209, 725 A.2d 1037 (1999). Therefore, unless the judge made a specific finding that no future abuse or neglect was likely to occur, she was required to deny visitation to Mr. B. or order supervised visitation.

Vacation of the judgment as to Michael B.'s case, as called for in the dissent, is unwarranted on this record and is premised on a misapplication of the provisions of § 9–101(b) of the Family Law Article. For the reasons to be explained, affirmance of the trial court's judgment is in order.

 The dissent postulates that if Mr. B.'s *proffer* to the trial court that he could not pay for the services of an off-duty police officer is credited, then he effectively has been denied visitation. The premise of this position, in the Majority's view, contains an inaccurate assumption and is unsupported in the record. During direct examination of Michael B. by his counsel at the Circuit Court hearing on 5 May 2004, the following colloquy occurred:

Q. Has the Department ever asked you to pay child support?

A. Nobody asked me to pay child support.

Q. Are you working?

A. Yes.

Q. Has the Department garnished your wages at all for child support?

A. No.

Q. There was no Court proceeding?

A. No. Correct.

Q. And you have no problem paying child support for Georgie?

A. Right. It's not necessary for me, for my wages to be garnished for it, because I offer everything that I have to my son, his mother and the rest of the children.

\* \* \*

A.—I'm trying to attend school. I was in attendance trying to become a pharmacist in an alternative medicine practice-type pharmacy.

Later in that hearing, during cross-examination by DSS's trial counsel, Mr. B. testified as follows:

Q. Mr. B., you are living at 102 East 20th Street; is that correct?

A. Yes.

Q. And what is that, a house or an apartment?

A. It's a two-level. I live in the first level of the apartment.

Q. You rent your own apartment there?

A. Yes. I have the whole first level.

Q. And you said that you are employed?

A. Yes.

Q. Where do you work?

A. Right now I work at—through the plumbers and steam-fitters union. I work for Herton (phonetic) Mechanical and I also do part-time work at my old temp agency Ready-Staffing.

Q. Your work, is it a full-time job?

A. Full-time. I make $12.95 an hour and I will be going for an interview with my apprenticeship on the 12th of this month and making $14.00 an hour. It used to be $13.00—something.

Q. How long have you been with your current employer?

A. How long? Since March the 17th, with that employer. But prior to that I was working seven days, twelve hours a week, seven days a week and twelve hours a day at fire watch, from just before Christmas Eve through part of February.

Then it was like two or three weeks where I was only doing part-time work, and then I was called to the plumbers and steamfitters union that I applied to six months before.

I had applied to every union that I could apply to. Knowing that they do lay off, and without conflicting with the union. I could be on the books already waiting. With the carpenters union also and the electrical union, that's still in the process.

Q. You have a fairly decent income?

A. Yes.

Q. [Your attorney] asked you about child support. Did you volunteer to pay any child support?

A. I do volunteer to pay it to Tammy [B.].

Q. Well, she doesn't have the child. What good would that do?

A. She will get the children.

Q. Well, someone is paying for his care right now. That's why I am asking you. Are you paying anything towards that.

A. No, I'm not. Except for—no. Not really. Not much at all.

Q. Is there any reason why you haven't volunteered to do so?

A. Volunteered to do so?

Q. Yes. We all pay for our children's support. No one makes us.

A. Basically, I feel like I would be happy to, but I don't have any contact to know what that money would be spent on. I have no contact with Georgie's foster-parent right now, and the other two didn't ask for it.

But yeah, I would be happy to pay child support. At the moment it would take a few months because I am in an adjustment now, right now, paying for my own medicine, and its costs $600 a month.

Thus, the state of the record before the trial court was not confined to a "proffer" of Mr. B.'s inability to afford to pay for the cost of an off-duty law enforcement officer to monitor the one-hour per month supervised visitation.[1] Rather, the Cir-

---

1. We assume the dissenting opinion's characterization of "proffer" flows from Mr. B.'s spontaneous negative interjection ("I don't.") when

cuit Court, based on evidence supplied by Mr. B., had sufficient actual evidence before it from which to arrive at a reasoned conclusion that Mr. B. likely could afford the additional condition of continued supervised visitation.

Mr. B.'s apparent qualification for legal representation by the Public Defender's Office in this matter, both in the Circuit Court and before us, does not establish his inability to afford the expense of the off-duty officer condition. In the absence of any evidence as to what his financial condition was at the time counsel was assigned to him by the Public Defender's Office,[2] the presumed determination of indigency at that time means only that he was then "financially unable, without undue hardship, to provide *full* payment of an attorney and *all* other necessary expenses of legal representation" (Md.Code 1957, 2003 Repl.Vol.), Art. 27A, § 2(f) (emphasis added), made applicable by § 5–323 of the Family Law Article. The determination of Mr. B.'s indigency for legal representation purposes obviously was made well before the facts as to his 17 March 2004 employment were adduced at the 5 May 2004 Circuit Court hearing. The hearing judge was entitled to consider the most current information in reaching her decision.[3] That information was ample to support affirmance on this record.

---

the Court, as it explained its ruling, stated, that "Mr. B .... has some financial ability to contribute towards things." Mr. B. continued to interrupt the court's explanation for its ruling by stating that he apparently would be able to afford something "[in a few months]. Right now I am paying a lot. My medical benefits are cut off and there are probationary requirements." Mr. B., when he seized the floor, neglected, however, to explain what or how "probationary requirements" affected his financial condition then or in the future. The burden to adduce evidence of an inability to afford the cost of the off-duty officer rested with Mr. B., under these circumstances.

2. Docket entries in the trial court in George B.'s case reflect that the Public Defender's Office entered its appearance initially for Michael B. on 19 August 2003.

3. In any event, not being able to afford fully the cost of a lawyer and all necessary litigation expenses in a protracted child custody/visitation matter is a far cry from not being able to afford the cost of an off-duty

■ The dissent's reasoning that the off-duty law enforcement officer condition for continuation of the one hour per month supervised visitation must be supported by an explicit finding that the officer was needed for the "safety, physiological, psychological, and emotional well-being" of George B. is not a statutory requirement. Even if it was, such a finding was implicit in the judge's ruling, in light of the record of this case.

Unlike apparently the dissent, we do not construe § 9–101(b) of the Family Law Article as requiring the trial court to find expressly that there "is no likelihood of further child abuse or neglect" by Michael B. before it may impose the relevant condition challenged in Michael B's appeal. First, the grammatical structure, i.e., hence the plain meaning, of § 9–101(b) permits, as an exception to the finding requirement that must be made generally to allow custody or visitation in the face of pre-existing abuse/neglect, the trial court to establish supervised visitation as long as the arrangements assure the safety and well-being of the child.

> § 9–101. Denial of custody or visitation on basis of likely abuse or neglect.
>
> \* \* \* \* \* \*
>
> (b) Specific finding required.—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, the court shall deny custody or visitation rights to that party, *except* that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

Md.Code (1984, 2004 Repl.Vol.) (Emphasis supplied).

The assurances supporting invocation of the exception must appear from the evidence of record in a given case, measured

---

law enforcement officer one hour per month. As to the availability of such officers to perform the services contemplated by the trial judge, it appears that certain sheriff's deputies in Baltimore County have performed in the same or similar capacities in the past. The trial judge stated that it was her "understanding that some of the sheriffs that are off duty will monitor supervised visitation and they'll do it at a fee."

against the arrangements ordered for the visitation. No express findings are required to be made by the trial court in that regard.

There was testimony before the trial judge that, at the 18 February 2004 supervised visitation between George B. and Michael B., it took four police officers to subdue Michael B. and that George B. saw what happened (testimony of Ms. Kristy Caceres and Officer Katie Winders at the 23 April 2004 hearing). Michael B. became unruly, yelling at social workers and refusing to leave when the visitation was terminated. In the course of ostensibly trying to prolong his visit with George B., Michael B. attempted to shove past Officer Winders by placing his shoulder into the officer's chest in an effort to move her from the doorway blocking his access to George B. Observing his father's conduct, George B. seemed frightened, confused, and shocked, according to Ms. Caceres. Thus, the record supports that it was not merely for the protection of the social workers that the trial judge imposed the condition that future visitations would be monitored, at Michael B.'s expense, by an off-duty law enforcement officer.[4] Clearly, an

---

4. A policy comment is in order, particularly for the benefit of other courts around the State, about the apparent direction given by the trial judge to the effect Michael B. locate, engage, and directly compensate an off-duty law enforcement officer to monitor future supervised visitations. Although we have no doubt that Michael B. may, and on this record should, be held responsible financially for implementation of the provision of additional security (occasioned by his misconduct) at the supervised visitations, it may not be appropriate, for policy, administration, and efficiency reasons, to make Michael B. directly the employer of the security person or, for that matter, that the universe of persons suitable to supply security be limited to off-duty law enforcement personnel. Although this record suggests that in Baltimore County off-duty deputy sheriffs have provided such services in the past (*see* Fn. 3, *supra*), such may not be the case elsewhere throughout the State. Moreover, having the parent responsible for identifying the particular personnel, engaging him or her, and paying the person directly may blur the "chain of command" probably intended by the trial court and/or the clarity with which the discharge of the security responsibilities is perceived by the security person. It may be more appropriate, for example, to direct DSS to engage an appropriate security person and for the parent to be responsible financially to DSS for the reasonable compensation for the service. In any event, no observation offered

additional goal of that condition was to inhibit Michael B. from causing further deleterious effects on George B.'s psychological and emotional well-being.

In any event, there is no indication in the record extract or any argument mounted by a party that the trial court failed to make any required statutory findings when it established, as the result of past periodic reviews, supervised visitation between Michael B. and George B. in December 2002 and continued such in June 2003 and November 2003. We fail to see why additional findings are required in the 6 May 2004 order continuing supervised visitation for the same one hour per month, but adding the additional condition of engagement of the off-duty officer, a condition occasioned solely by Michael B.'s misconduct at the 18 February 2004 visitation. If Michael B. has additional evidence bearing on his inability to pay for the off-duty officer (or that such a condition is no longer necessary), he may present it at a subsequent periodic review hearing in the Circuit Court.

Accordingly, the judgment in Michael B.'s case also is affirmed.

AS TO PART I, MS. B'S APPEAL, THE ORDERS OF MAY 6, 2004, RELATING TO BILLY W. AND GEORGE B. ENTERED BY THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; AS TO JESSICA W. AND MARY S. DISMISSED.

AS TO PART II, MR. B'S APPEAL, THE ORDER OF MAY 6, 2004, RELATING TO GEORGE B. ENTERED BY THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

Judges RAKER, WILNER and GREENE authorize me to state that they join in this opinion.

---

here is intended to suggest that this Court is acting other than to affirm the judgment in Mr. B.'s appeal.

Dissenting Opinion by BATTAGLIA, J. as to Part II, which BELL, C.J. and CATHELL, J., join.

I respectfully dissent from Part II of this opinion regarding the disposition of Mr. B.'s appeal.

The majority concludes that the trial court properly exercised its discretion in requiring Mr. B. to hire an off-duty law enforcement officer to supervise his visitation with George B. I would find that the trial court failed to comport with the requirements of Section 9–101 of the Family Law Article in restructuring Mr. B.'s supervised visitation. In addition, I would conclude that the trial court failed to make adequate findings concerning Mr. B.'s ability to pay for the services of an officer prior to including such a provision as a condition of his supervised visitation. Therefore, in my opinion the judgment of the Circuit Court as to Mr. B. should be reversed and Mr. B.'s case should be remanded for further proceedings.

The trial court is constrained by the requirements of Section 9–101 of the Family Law Article when setting the conditions of visitation. Section 9–101 states:

(a) *Determination by court.*—In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(b) *Specific finding required.*—Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party, *the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.*

Md.Code (1974, 1999 Repl.Vol.), § 9–101 of the Family Law Article (emphasis added).

Thus, when a court has reasonable grounds to believe that neglect or abuse has occurred, as did the court in this case, custody or visitation must be denied, except for supervised

visitation, unless the court makes a specific finding that there is no likelihood of further abuse or neglect. *See In re Yve S.,* 373 Md. 551, 566–68, 819 A.2d 1030, 1039–40 (2003). If the court determines that supervised visitation is appropriate, the court must assure that such visitation will not jeopardize the safety and well-being of the child.

The court ordered that Mr. B. would have supervised visitation with George B. on the condition that Mr. B. pay for a law enforcement officer to supervise the visitation, due to safety concerns for DSS representatives who were managing the visits. Although the safety of DSS representatives is an important concern, it is not within the findings necessary to satisfy the statutory prerequisites for the approval of a "supervised visitation arrangement," because the court is only to approve such an arrangement if it assures the "safety, physiological, psychological, and emotional well-being" of the child. *See* Md.Code (1974, 1999 Repl.Vol.) § 9–101(b) of the Family Law Article. In the present case, the trial court never correlated the need to restructure the supervised visitation with George B.'s well-being. Rather, the court's focus was *solely* on concerns for the safety of DSS representatives.

Further, the trial court's prerequisite that Mr. B. pay for an officer to supervise the visitation without determining his ability to pay for such services is problematic. The record clearly establishes that Mr. B. previously had been determined to be indigent when he qualified for representation by the Public Defender's Office. Moreover, when the trial judge stated that Mr. B. could "contribute toward things," Mr. B. proffered to the court that he would be unable to contribute because he was "paying a lot," his "medical benefits were cut off" and he had other probationary requirements.

The Majority relies on statements made by Mr. B. while testifying on his ability to care for George B., to support its conclusion that "Mr. B. likely could afford the additional condition of continued supervised visitation." Maj. op. at 454. When testifying, Mr. B. stated that he had a job and had to pay for his medical expenses. His testimony, however, did not

specify the extent of his obligations and was not an exploration of the available options for supervised visitation. As an alternative to Mr. B. paying for an off-duty officer, counsel for Mr. B. requested to have the visitation supervised under the Young Fathers/Responsible Fathers program; however, the trial court declined that option and embraced the off-duty officer alternative without determining the extent of Mr. B.'s financial resources to pay for an officer, the cost of which was never established. In light of the lack of factual findings regarding Mr. B.'s financial capabilities, the trial court should have made findings about Mr. B.'s ability to pay for the off-duty officer before conditioning his visitation on securing such services.

Additionally, I suspect that conditioning visitation upon the ability to pay for the services of an off-duty officer may present constitutional problems because a parent without financial resources could effectively be denied visitation as a result of indigency, whereas a parent with adequate financial resources would not. Although a trial judge may set reasonable conditions on a parent's visitation, such conditions must comport with basic constitutional requirements, including equal protection of the law.[1] *See In re Laurence T.*, 285 Md. 621, 630, 403 A.2d 1256, 1261 (1979) (holding that juvenile in delinquency proceeding was denied equal protection when the State's decision to file a petition against the juvenile was based upon his parent's ability to pay restitution); *Raible v. Raible*, 242 Md. 586, 597, 219 A.2d 777, 782 (1966) (determining that in a divorce proceeding the court could impose condition that the father pay child support to receive visitation so long as he had the ability to pay); *see also Haynes v. State*, 26 Md.App. 43, 50–51, 337 A.2d 130, 135–36 (1975) (holding that a court may order an indigent criminal defendant to reimburse the State for services rendered by a public defender as a special condi-

---

1. U.S. Const. amend. XIV, § 1 reads in pertinent part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

tion of probation, if there is a determination that the defendant has the ability to pay for the costs incurred).

For these reasons, I would reverse the judgment of the Circuit Court as to Mr. B. and remand the case for further proceedings.

Chief Judge BELL and Judge CATHELL authorize me to state that they join in this dissent.